IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**DENNIS WILSON and**
**MADELINE WILSON**,

      Plaintiffs,

vs.                                                   No. CIV 04-1184 MCA/RLP

**VIRGINIA CARLENE CRUISE,**

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiff's *Application for Default Judgment* [Doc. 8], filed October 31, 2005. The Court held a hearing on damages on March 22, 2006. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court finds that (1) Plaintiff Dennis Wilson is entitled to a default judgment against Defendant Virginia Carlene Cruise in the total amount of $776,328.00, and (2) Plaintiff Madeline Wilson is entitled to a default judgment against Defendant Virginia Carlene Cruise in the total amount of $110,325.00.

## I. FINDINGS OF FACT

The well-pleaded factual allegations in Plaintiffs' *Complaint* [Doc. 1] are accepted as true by virtue of Defendant's default. In addition, the Court makes the following findings of fact with respect to the issue of damages:

1.     Defendant Virginia Carlene Cruise was properly served in this action not later than July 25, 2005. [See Docs. 3-5, 7].

2. Cruise has failed to answer the *Complaint* or otherwise appear in this action at any time and is in default. [Doc. 14].

3. Plaintiffs Dennis Wilson and Madeline Wilson each sustained personal injuries and medical expenses as a direct result of the conduct of Defendant in causing a collision with Plaintiffs' vehicle at 1:14 p.m. on January 24, 2004 on San Mateo Boulevard NE in Albuquerque, New Mexico.

### **Dennis Wilson's Injuries and Medical Expenses**

4. On January 24, 2004, Mr. Wilson was driving his car, with Madeline Wilson as a front-seat passenger, when their vehicle was struck from behind by a van being driven by Defendant.

5. Mr. Wilson presented the medical testimony of Eric A. Thomas, M.D., and Carlos J. Esparza, M.D., via deposition. Both depositions were taken March 20, 2006, two days prior to the hearing on damages.

6. After the 2004 collision, Mr. Wilson returned to Dr. Esparza, who had treated him after a 1995 vehicular accident.

7. Medical evidence presented by Dr. Esparza indicated that Mr. Wilson was treated by Dr. Esparza prior to the January 2004 collision for "some neck symptoms, neck pain, and some arm and shoulder symptoms."

8. Dr. Esparza described Mr. Wilson as "doing pretty well" with the prior treatment.

9. Mr. Wilson visited Dr. Esparza on March 18, 2004. At that time, Mr. Wilson described experiencing a sudden, sharp pain in the neck region, as well as neck pain

and left-arm pain, numbness and tingling to fingers—all of which were experienced after the 2004 collision.

10. Dr. Esparza diagnosed Mr. Wilson with cervical disc protrusion of C5-6, C6-7, and C7-T1, with the left side "now being symptomatic" and also some evidence of radicular findings on the left side. Mr. Wilson was also diagnosed with a lumbar sprain/strain. [Exh. 2 at 5].

11. Dr. Esparza treated Mr. Wilson by giving him trigger point injections to help with muscle spasms, and cervical epidural injections. [Exhibit 2 at 6].

12. Dr. Esparza opined that Mr. Wilson had some progression of prior symptoms, "which probably were an aggravation from the accident, but also had symptoms consistent with those disc herniations of the cervical spine that were likely aggravated by the motor vehicle accident." [Id.].

13. Dr. Esparza recommended that Mr. Wilson undergo surgery.

14. When asked about Mr. Wilson's current condition, Dr. Esparza described Mr. Wilson as "still having some local spasms in the neck region, but [having] had some progressive return of the feelings to his hands and does not have the radiating pain in his arm." [Exh. 2 at 7]. Dr. Esparza further opined that there *may* be further deterioration to the levels above and below the fusion at a quicker pace than would naturally occur.

15. In Dr. Esparza's opinion, Mr. Wilson has had a surgery and fusion and "is doing well now."

16. Dr. Thomas performed surgery on Mr. Wilson in October 2005. He described the surgery as an anterior cervical discectomy and fusion of C5-6 and C6-7.

17. Surgery was performed because Mr. Wilson had two degenerative discs in his neck that were causing neck pain and the discs were also herniated and causing Mr. Wilson chronic arm pain.

18. When asked about Mr. Wilson's prognosis after surgery, Dr. Thomas stated that Mr. Wilson "is doing quite well. His arm pain has resolved and his neck pain is dramatically improved. He is regaining strength in his affected arm."

19. Dr. Thomas described the surgery as "successful."

20. Through his deposition, Dr. Esparza stated that the amount of money he charged Mr. Wilson represented reasonable medical charges for reasonably necessary services. [Exh. 2 at 12].

21. In deposition testimony, Dr. Thomas stated that the total amount of Mr. Wilson's hospital bill showed a reasonable and expected figure for the surgery that was performed. [Exh. 3 at 7].

22. Mr. Wilson has presented credible evidence to support his claim for $76,328.00 in medical expenses. [Exhibit 2, Attachments; Exh. 3, Attachments].

23. Mr. Wilson has presented credible evidence that he sustained an aggravation of a pre-existing condition as a result of the January 2004 collision.

**Dennis Wilson's Pain and Suffering, Loss of Quality of Life, and Emotional Distress**

24. After the collision but prior to his surgery, Mr. Wilson experienced continuous pain

that he described as "absolutely unforgiving."

25.  Mr. Wilson's pain was so intolerable that he contemplated suicide.

26.  Mr. Wilson found relief immediately following surgery, but has since begun to experience tingling in his fingers and a tendency to drop things. He also stated that his hands "just give out at times."

27.  After the surgery, Mr. Wilson was informed that he will never be pain free and that his neck will never be "back to 100 percent."

28.  While Mr. Wilson experiences "light" pain on some days, on other days it is unbearable.

29.  Mr. Wilson is "almost continuously" on morphine and worries about becoming addicted.

30.  At night, the pain can become so intense that it takes Mr. Wilson hours to fall asleep.

31.  Mr. Wilson cannot remember having one uninterrupted night of sleep since the collision.

32.  More than two years after the collision, Dennis Wilson was still seeing Dr. Esparza for injections to help ease his pain. [Exh. 2, Attachments].

33.  In the time period between his 1995 accident and the 2004 collision with Cruise's vehicle, Dennis Wilson had become sufficiently healthy that he was able to engage in such physical activities as fly fishing, hunting, camping, riding a motorcycle, and scuba diving.

34.  Prior to the 2004 collision, Dennis Wilson took a course on building bamboo fly rods.

35. Mr. Wilson can no longer build fly rods because he cannot sufficiently move his neck or stretch his arms.

36. Mr. Wilson is no longer able to fly fish.

37. On the advice of Dr. Esparza, Mr. Wilson sold his motorcycles.

38. Mr. Wilson no longer hunts or camps because he is unable to lift and attach his camping trailer.

39. As a result of the January 2004 collision, Mr. Wilson testified that he no longer has a sex life, despite his use of medications such as Viagra.

40. The year before the collision with Cruise's vehicle, Mr. Wilson, a Grand Knight in the Knights of Columbus, logged over 1,500 hours of volunteer work with that organization.

41. Mr. Wilson has not been able to be active as a Grand Knight and does not intend to run for reelection later this year.

42. Mr. Wilson cannot read books for any length of time because he gets migraine headaches.

43. On a typical day, after Mr. Wilson checks his computer for e-mail and goes out for coffee, either alone or with a friend. He then returns home to watch television or "hang out." He makes his dinner around 4:30 and goes to bed sometime between 7:30 and 8:30.

44. Mr. Wilson has four grandchildren but can no longer "roughhouse" with them or pick them up.

45. Mr. Wilson, who was a gunship pilot in Vietnam, was diagnosed with post-traumatic stress disorder in 1995 or 1998.

46. As a result of the January 2004 collision, Mr. Wilson experienced a decline and deterioration in the quality of his life.

### **Madeline Wilson's Injuries and Medical Expenses**

47. Mrs. Wilson was a front-seat passenger in the vehicle being driven by her husband when their automobile was struck from behind by Defendant's van.

48. The injuries that Mrs. Wilson sustained as a result of the collision were less extensive than those sustained by Mr. Wilson.

49. Immediately after the collision, Mrs. Wilson developed a bad headache and felt nauseous for approximately the next three hours.

50. Mrs. Wilson's headaches continued for approximately three months after the collision, as did tension and soreness in her neck.

51. Mrs. Wilson, who had visited a chiropractor prior to the collision, continued to see him for adjustments. The chiropractic adjustments helped Mrs. Wilson feel better.

52. Mrs. Wilson occasionally experiences minor upper back and shoulder pain as a direct result of the collision and continues to receive treatment for that pain. The treatments help Mrs. Wilson feel better.

53. Mrs. Wilson no longer experiences the consistent headaches she experienced immediately after the collision.

54. Mrs. Wilson has presented credible evidence to support a claim to $325.00 in medical

expenses.  [Exhibit 4].

## **Madeline Wilson's Pain and Suffering, Loss of Quality of Life, and Loss of Consortium**

55.    Prior to the collision, Mrs. Wilson engaged in motorcycle riding, camping, and fly fishing with her husband.

56.    Since the accident, the Wilsons no longer ride motorcycles, camp, or fly fish together.

57.    The Wilsons started taking dancing lessons after the collision, but stopped when Mr. Wilson became unable to manage certain dance maneuvers.

58.    Before the collision, the Wilsons led an active life together.

59.    Mrs. Wilson testified that, since the collision, she and Mr. Wilson have "stopped doing things together[,]" and that "basically he does his thing and I do mine."

60.    Mrs. Wilson described her post-collision life with Mr. Wilson as significantly different from their life together prior to the collision.

61.    Mrs. Wilson testified, however, that Mr. Wilson had been diagnosed with post-traumatic stress disorder ("PTSD") in 1995 or 1998, which was at least six years before the collision.

62.    Nevertheless, according to Mrs. Wilson, Mr. Wilson "was getting [his PTSD] under control and . . . was doing really, really well and we were getting along great[,]" until after the collision, when Mrs. Wilson began to see "a very definite change" in her husband.

63.    Before the collision, the Wilsons had what Mrs. Wilson described as a good sex life.

64. Mrs. Wilson described her sex life with Mr. Wilson since the collision as "very frustrating."

65. Mrs. Wilson described her quality of life with Mr. Wilson since the collision as "just [a] daily existence type thing."

## II. ANALYSIS

### A. Jurisdiction

The law of the Tenth Circuit requires that "judgment by default should not be entered without a determination that the court has jurisdiction over the defendant." Dennis Garberg & Assocs., Inc. v. Pack-Tech Int'l Corp., 115 F.3d 767, 771 (10th Cir. 1997). Thus, before entering a default judgment "the district court has an affirmative duty to look into its jurisdiction both over the subject matter and the parties." Williams v. Life Sav. and Loan, 802 F.2d 1200, 1203 (10th Cir. 1986).

In this case, the Court has reviewed the record and is satisfied that it has jurisdiction over both the subject matter and the parties at issue. In particular, the Court finds that Defendant, as a citizen of the State of Texas, is of diverse citizenship from each Plaintiff, as citizens of the State of New Mexico, and was properly served with the *Complaint* and waived service of a *Summons*. Further, there is no evidence to suggest that Defendant is an infant, an incompetent person, or a soldier or sailor who is shielded from entry of a default judgment under these circumstances.

In addition to finding diversity of citizenship, the Court must be satisfied that the amount in controversy exceeds $75,000, exclusive of interest and costs. See 28 U.S.C.

§ 1332. Each Plaintiff must meet the amount-in-controversy requirement. <u>Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.</u>, 407 F.3d 1091, 1104 (10th Cir. 2005) (In class action, explaining that "[t]he rule in this circuit is that each plaintiff in a diversity-based . . . action must meet the required jurisdictional amount in controversy."); <u>see also</u> <u>Snyder v. Harris</u>, 394 U.S. 332, 335 (1969) (As general rule, "the separate and distinct claims of two or more plaintiffs cannot be aggregated in order to satisfy the jurisdictional amount requirement."). "The test for whether a case satisfies the amount in controversy requirement is whether the complaint makes a good-faith claim for the amount[.]" <u>Herremans v. Carrera Designs, Inc.</u>, 157 F.3d 1118, 1121 (7th Cir. 1998).

In this case, I am satisfied that, at the time the *Complaint* was filed, each Plaintiff possessed a good-faith claim for an amount in excess of $75,000. Both Plaintiffs claimed "substantial and lasting injuries" as a result of the collision. Moreover, Dennis Wilson, who had a preexisting injury from an earlier automobile collision, claimed, as a result of the collision with Defendant, to have suffered a serious setback, which aggravated his preexisting condition and seriously affected his quality of life. Madeline Wilson claimed that, as a result of the collision with Defendant, she now suffers from chronic headaches and "has experienced excruciating and prolonged pain[,] which defies effective treatment." [Doc. 1 at ¶ 7]. In light of these allegations, I am satisfied that, at the time they filed their *Complaint*, each Plaintiff had a good-faith claim to an amount in controversy in excess of $75,000.

**B. Damages**

The Tenth Circuit has held that "a court may enter a default judgment without a hearing only if the amount claimed is a liquidated sum or one capable of mathematical calculation." Hunt v. Inter-Globe Energy, Inc., 770 F.2d 145, 148 (10th Cir. 1985). In cases where a hearing is necessary, "the calculation of damages requires the Court to look beyond the averments of the complaint. The Court is required to examine the sufficiency of all evidence with respect to damages, and, when evidence is deemed insufficient, to ascertain the appropriate level of damages through its own inquiry." Joe Hand Promotions, Inc. v. Hernandez, 2004 WL 1488110, at *2 (S.D.N.Y. June 30, 2004) (citations omitted). The amount of damages assessed through such an inquiry rests in the sound discretion of the Court. See Cable/Home Commc'n Corp. v. Network Prods., Inc., 902 F.2d 829, 852 (11th Cir. 1990).

While in this context "[d]ecisions to enter judgment by default are committed to the district court's sound discretion, . . . a decision based on an erroneous view of the law is an abuse of discretion." Dennis Garberg & Assocs., Inc., 115 F.3d at 771. Thus, it is erroneous to enter a default judgment if, as a matter of law, Plaintiffs' *Complaint* fails to state a claim upon which relief may be granted.

> [A] defendant's default does not in itself warrant the court entering a default judgment. There must be a sufficient basis in the pleadings for the judgment entered . . . . The defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law. . . . In short, . . . a default is not treated as an absolute confession of the defendant of his liability and of the plaintiff's right to recover.

11

Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank, 515 F.2d 1200, 1206 (5th Cir. 1975). Further, a default judgment may not award relief that is greater in kind or amount than that sought in the *Complaint*. See Fed.R.Civ.P. 54(c); Scala v. Moore McCormack Lines, Inc., 985 F.2d 680, 683 (2d Cir. 1993).

Under the authorities cited above, any award of damages based on Defendant's default must be preceded by a determination of whether Plaintiffs' pleading states a claim upon which relief may be granted. If Plaintiffs surmount this preliminary hurdle, the Court must further determine whether the law confers discretion to determine the amount of damages, and if so, what factors are relevant to the Court's exercise of such discretion.

In this case, Plaintiffs' *Complaint* sounds in both negligence and negligence *per se*. "'[A] negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based upon a standard of reasonable care, and the breach being a proximate cause and cause in fact of the plaintiff's damages.'" Spencer v. Health Force, Inc., 107 P.3d 504, 510 (N.M. 2005) (*quoting* Herrera v. Quality Pontiac, 73 P.3d 181, 185-186 (N.M. 2003)).

> The test for negligence per se is the following: (1) there must be a statute which prescribes certain actions or defines a standard of conduct, either explicitly or implicitly, (2) the defendant must violate the statute, (3) the plaintiff must be in the class of persons sought to be protected by the statute, and (4) the harm or injury to the plaintiff must generally be of the type the legislature throught [sic] the statute sought to prevent.

Archibeque v. Homrich, 543 P.2d 820, 825 (N.M. 1975); accord Abeita v. Northern Rio Arriba Elec. Co-op., 946 P.2d 1108, 1116 (N.M. App. 1997).

Because the well-pleaded factual allegations in Plaintiffs' *Complaint* are deemed admitted by virtue of Defendant's default, and each Plaintiff has submitted admissible evidence of their personal injuries and medical costs, I conclude that Plaintiffs have met their burden of proving each element of their negligence claims against Defendant. I also conclude, based on the allegations set forth in paragraph 8 of their *Complaint*, that Plaintiffs have adequately pled a claim of negligence *per se*, though barely.[1]

### 1. The Wilsons' Medical Expenses

As for the specific amount of damages, I conclude that Mr. Wilson's claim for $76,328.00 in medical expenses is supported by the evidence of record and does not exceed the scope of relief requested in the *Complaint*. I do not, however, conclude that Mrs. Wilson's claim for $424.49 in medical expenses is supported by the evidence of record. This is because, at the hearing on damages, Mrs. Wilson explained that the medical expenses she sought to recover were reflected in insurance statements showing the total amount charged before co-payments or insurance reimbursements. [Testimony of Madeline Wilson; see also Exh. 4, "Medical Explanation of Benefits"]. The Court calculates the total amount of such

---

[1] Paragraph 8 alleges that

> [a]t all times material hereto, Defendant Cruise had a duty to exercise ordinary care in the operation of her motor vehicle, to keep a proper lookout and to maintain proper control over her vehicle so as to avoid placing others in danger. Failure to do so was a violation of the criminal laws of the state of New Mexico concerning operation of motor vehicles, and constituted negligence per se.

[Doc. 1 at ¶ 8].

13

charges as $325.00. Accordingly, Mrs. Wilson is entitled to recover $325.00 in medical expenses.

### 2. Mr. Wilson's Damages for Pain and Suffering, Loss of Quality of Life, and Emotional Distress

In determining an amount of money that will reasonably and fairly compensate Dennis Wilson for the pain and suffering he has sustained as a result of the collision, I have considered (1) the nature, extent, and duration of Mr. Wilson's injuries; (2) his emotional distress and loss of enjoyment of life; and (3) the aggravation of his preexisting condition. In light of these considerations, I conclude that Dennis Wilson is entitled to an award of damages for pain and suffering, loss of quality of life, and emotional distress in the amount of $700,000.00. See UJI 13-1802 NMRA, UJI 13-1806 NMRA, UJI 13-1807 NMRA, and UJI 13-1808 NMRA; see also Sandoval v. Chrysler Corp., 960 P.2d 834, 838 (N.M. App. 1998) (recognizing that there is no standard fixed by law for measuring the value of pain and suffering and explaining that the amount of such an award necessarily rests with the good sense and deliberate judgment of the tribunal assigned by law to ascertain what is just compensation (internal quotations omitted)).

### 3. Mrs. Wilson's Damages for Pain and Suffering, Loss of Quality of Life, and Loss of Consortium

In determining an amount of money that will reasonably and fairly compensate Madeline Wilson for the pain and suffering she has sustained as a result of the collision, I have considered the nature, extent, and duration of her injuries, as well as her loss of enjoyment of life. I have also considered Mrs. Wilson's emotional distress due to the loss

of consortium resulting from the injuries to Mr. Wilson. See UJI 13-1810A NMRA (defining "loss of consortium" as the emotional distress of the plaintiff due to the loss of the society, guidance, companionship, and sexual relations resulting from the injury to the injured party). In light of these considerations, I conclude that Madeline Wilson is entitled to an award of damages for pain and suffering, loss of quality of life, and loss of consortium in the amount of $110,000.00. See Sandoval, 960 P.2d at 838.

### III. CONCLUSION

For the foregoing reasons, the Court shall enter a default judgment awarding a total of $776,328.00 ($76,328.00 in medical expenses and $700,000.00 for pain and suffering, loss of quality of life, and emotional distress) in damages to Plaintiff Dennis Wilson, and a total of $110,325.00 ($325.00 in medical expenses and $110,000 for pain and suffering, loss of quality of life, and loss of consortium) in damages to Plaintiff Madeline Wilson.

**IT IS, THEREFORE, ORDERED** that Plaintiff's *Application for Default Judgment* [Doc. 8] is **GRANTED** and a default judgment against Defendant Virginia Carlene Cruise shall be entered concurrently with this *Memorandum Opinion and Order*.

**SO ORDERED** this 10th day of April, 2006, in Albuquerque, New Mexico.

                                                  **M. CHRISTINA ARMIJO**
                                                  United States District Judge

16